[Civ. No. 4430.  Third Appellate District.—July 9, 1932.]

C. N. NELSON, Appellant, v. C. A. BOWEN et al., Respondents.

Edwin T. McMurray and Sidney Rhein for Appellant.

Francis V. Keesling, C. A. S. Frost and Chenoweth & Leninger for Respondents.

PLUMMER, J.—Judgment went for the defendants in an action prosecuted by the plaintiff to recover damages for and on account of an alleged conversion of a crop of prunes. From this judgment the plaintiff appeals.

On the twenty-seventh day of October, 1926, the Shasta Orchard and Farm Company, Inc., hereinafter referred to as the "Orchard Company", was the owner of a certain farm in the county of Shasta, comprising about 600 acres. The Orchard Company was a corporation owned by the family of Harry S. Bates. Harry S. Bates was the president and managing agent. His son, Merrill Bates, was the secretary. His wife, Gladys Bates, was the third member of the corporation.

On or about the date mentioned the Orchard Company effected a loan with the Lincoln National Life Insurance Company, hereinafter referred to as the "Insurance Company", by which the Insurance Company advanced to the

Orchard Company the sum of $70,000. A note and trust deed were executed by the Orchard Company to secure the repayment of said sum, together with interest thereon at the rate of seven per cent per annum.

It appears that the indebtedness of the Orchard Company was somewhere in the neighborhood of $132,000; that the Northern National Bank of Redding had, prior to the dates mentioned, financed the raising of crops on the Orchard Company's property, but that in the spring of 1927, the Redding Bank declined to advance any more money to the Orchard Company to defray the expenses of caring for, harvesting and marketing the crops to be grown upon the 600 acres of land for the year 1927. The record indicates that the Orchard Company was without funds. Under date of March 28, 1927, president Bates of the Orchard Company, wrote to R. A. Thorne, manager of the mortgage department of the Insurance Company at Fort Wayne, Indiana. In this letter Bates informed the Insurance Company that the Redding Bank would not advance any more money; that he had taken the matter up with four large real estate offices in San Francisco, with the idea of selling the premises for the debts thereon so that the company could "quit clean"; that he had made arrangements for starting plowing on April 1st, but under the circumstances he had been compelled to cancel such arrangements; thereafter, on April 8, 1927, A. A. Semsen, California loan officer of the Insurance Company, went to the ranch to make investigation as to existing conditions. In an interview with Bates, Semsen was informed by him that the Company was unable to make arrangements with the Redding Bank, and that he could not go ahead with the work. The trust deed given to secure the promissory note thereinbefore referred to empowered the company to do necessary work in caring for the crops that should be raised upon the premises in the event that the Orchard Company failed in such particulars. The purpose of Semsen's visit to the Orchard Company's property was to serve a notice upon the Orchard Company of the requirements of the trust deed. At the interview to which we have referred it was suggested to Semsen as to whom he could employ to do the plowing. Thereafter, on April 19th, Semsen employed the defendant C. A. Bowen, who at that time was living at Cottonwood, a town not far from the premises involved in this action.

Semsen took Bowen to the ranch on the 20th of April, and advised Bates that Bowen had come to plow the ranch. Bowen thereupon moved his family and household effects and equipment to the ranch, and at first lived in what is known as the "lower ranch house". Bates thereafter commenced packing his personal belongings, household effects, etc., and on May 26, 1927, moved with his family from the ranch to San Francisco. The Bates family did not thereafter return to the ranch, nor did anyone, for or on behalf of the Orchard Company, ever have anything further to do with the cultivation, care, harvesting and marketing of the crops grown upon the premises. At the time the Bates family left the ranch, Mr. Bates told Bowen that he expected to move to San Francisco and there go into business. It appears that everything belonging to the Bates family, excepting a safe, was moved from the ranch to San Francisco. The record shows that even the electric light fixtures were taken out of the residence formerly occupied by the Bates family, and sold to a second-hand dealer. During the year 1927 Bowen plowed the orchard and vineyard on the ranch, sulphured the trees, cleaned the dead wood out of the orchard, picked the grapes, peaches and pears, and harvested, dried and shipped the prunes. In connection with the drying of the crops, the dehydrator on the premises was repaired, and its operation superintended by Bowen. Additional labor was employed when required, and from time to time Semsen visited the ranch and superintended its operations. Accounts of the expenses incurred as well as receipts received were transmitted to the home office of the Insurance Company in Fort Wayne.

After the Bates family left the ranch, Bowen moved his family into the main ranch-house on or about June 13, 1927. Bates' family took an apartment in San Francisco. On July 12, 1927, Bates sold all of the stock of the Orchard Company to one W. L. Wolf, a real estate dealer. The sale took place in San Francisco. In the transaction C. N. Nelson, who had previously been a partner of Wolf, transferred a house in Redwood City to the Orchard Company. This property was transferred to Bates for his equity in the ranch. Bates took the Redwood City property subject to the $20,000 mortgage. Wolf gave the Orchard Company a note for $20,000, and the Orchard Company gave Nelson a note for $20,000

secured by chattel mortgage on the 1927 prune crop then being and growing on the premises involved in this action, covered by the trust deed first referred to herein. On July 15, 1927, Wolf and Nelson visited the ranch in Shasta County. Wolf introduced himself to Bowen and told Bowen that he had purchased the stock of the Orchard Company from Bates. Wolf and Nelson, accompanied by Bowen, went over a portion of the ranch. Nelson stated he had not before seen the ranch. During the conversation Bowen stated that he was working for the Insurance Company, and not for Bates. This conversation was in the presence of Nelson. On July 16, 1927, Wolf and Nelson went to the ·recorder's office in Redding and recorded Nelson's crop mortgage. On the previous day, July 15th, the Insurance Company had recorded a notice of default and intention to foreclose its deed of trust. This record was examined by Wolf and Nelson, as shown by the fact that Wolf stated he had seen, while in Redding, that the Insurance Company had recorded a notice of defaut. Neither Wolf nor Nelson ever called to see or communicated with Semsen about the ranch. Nelson never again visited the ranch. Bowen harvested the prune crop, the Insurance Company paying all the expenses. The prune crop which was by reason of "red spider", somewhat light, sold for the sum of $5,276.88. The sale was made on October 14, 1927. The prunes were shipped from Cottonwood on October 23, 1927. On October 20, 1927, an attorney by the name of Edward T. Sullivan, representing Nelson, went to the ranch, read a notice to Bowen that Nelson, as mortgagee, took possession of the prunes. This notice was tacked up on the warehouse. This was the only action ever taken by Nelson after taking his chattel mortgage on July 12, 1927, relative to the prune crop. The expenses of cultivating, caring for, pruning, sulphuring and harvesting the prune crop amounted to the sum of $5,893.89. The net loss on the prune crop for 1927 was $617.01. The total profit on the operation of the ranch for the year 1927 was the sum of $947.68, which sum was credited on the indebtedness of the Orchard Company when the trust deed was foreclosed on November 21, 1927. The profit came from sales of peaches, grapes, and rent of the dehydrator. The peaches, grapes and dehydrator were not covered by the chattel mortgage.

The foregoing facts present for our consideration, first: A question as to whether the Insurance Company was a mortgagee in possession and had entered with the consent of the mortgagor, or rather, with the consent of the grantor named in the trust deed; second: Did the Insurance Company, as a mortgagee in possession, have a right to sell the prune crop and apply the proceeds to the indebtedness? and finally: If the Insurance Company was not technically a mortgagee in possession, was it not, nevertheless, entitled to reimbursement for the expense of caring for and harvesting the crop of prunes?

The statement of facts shows that the Orchard Company was without funds; that it was upon the request, and therefore upon the consent, of the Orchard Company that the Insurance Company placed a man upon the premises to do the necessary work, advanced the necessary funds and superintended all the work in managing the farm, caring for, harvesting and marketing the crops grown thereon. The facts show that the Bates family left the ranch early in the spring, paid no further attention to the crops, did nothing in relation thereto further than to execute the chattel mortgage in July, 1927. The chattel mortgage referred to was executed in San Francisco before either Wolf or Nelson had visited the ranch. Upon visiting the ranch the plaintiff found a representative of. the Insurance Company with his family, living in the Bates house and caring for the property. Nothing was said by Wolf or Nelson relative to the harvesting of the prunes; no attention was paid thereto, save and except as we have hereinbefore stated. Upon visiting the recorder's office at Redding, the plaintiff and Wolf saw the notices of default to which we have referred, and also were advised of the existence of the trust deeds upon the premises.

The trial court found the failure of the Orchard Company to plow, sulphur or otherwise care for the orchards and vineyards growing on the real property covered by a deed of trust, and that on or about the nineteenth day of April, 1927, the Insurance Company peaceably and lawfully took possession of the real property and all the appurtenances, including as well the growing crops thereon, and that upon said date the Orchard Company peaceably surrendered possession thereof to respondent Insurance Company; that the

Insurance Company thereafter plowed, cultivated, sulphured, cared for and harvested and marketed all the crops growing on said premises, and paid all the expenses thereof; that the occupancy of the Insurance Company was open, notorious, etc.; that on and after the nineteenth day of April, 1927, the Orchard Company exercised no control whatever over said property, or of the growing crops thereon, and did not in any manner care for, harvest or market any of the growing crops; that on the twenty-sixth day of May, 1927, the Orchard Company, its agents, officers and employees, removed from said real property and wholly abandoned the same, and thereafter, and at all times mentioned herein abandoned said property and surrendered the possession thereof to the Insurance Company; that thereafter the Insurance Company at all times continued to hold the possession of said property, and of the crops growing thereon; that the crops on said property consisted of prunes, peaches, grapes and other fruits; that the cost and expense of cultivating, caring for and marketing the crops growing on said property for the year 1927 amounted to $7,629.15; that the total receipts for all the crops grown on said premises amounted to the sum of $8,576.83, leaving a net balance of $947.68, which was credited upon the indebtedness of the Orchard Company to the Insurance Company; that the total receipts from the sale of the crop of prunes was the sum of $5,276.88; that the costs of plowing, cultivating, sulphuring, pruning, harvesting, drying and marketing the prune crop amounted to the sum of $5,893.89 leaving a net loss on the prune crop of $617.01.

The court further found the execution of the instruments which we have hereinbefore mentioned, and the filing of the chattel mortgage by the plaintiff, according to the facts which we have hereinbefore set forth, and also a knowledge by the plaintiff of the possession by the Insurance Company, and also the fact that none of the parties involved in this action offered to take care of said crop or expended any fund necessary for the care, cultivation and harvesting of the crops on said premises.

Under the circumstances which we have hereinbefore recited it seems clear to us that the finding of the court of the abandonment of the premises by the Orchard Company is clearly sustained by the testimony. It is likewise well es-

tablished that the possession of the premises was peaceably turned over to the Insurance Company, and that the intent and understanding of the Orchard Company and the Insurance Company was that the Insurance Company should continue in possession, cultivate the premises, care for and market the crops, pay the expenses thereof, and deduct the expenses from the amounts received for the sale of any harvested crops. The fact that Bates, after leaving the premises, endeavored to make sale of the same in order to clean up his indebtedness does not militate against a single finding of the trial court. The title to the premises still remained in the Orchard Company, and whatever Bates might do, or whatever the Orchard Company might do in relation to the title in an endeavor to make sale of the premises had no bearing upon the possession vested in the Insurance Company. It does not appear from the record that the effort of the Orchard Company or of Bates to make sale, in any manner interfered with the possession of the Insurance Company, or contemplated any such interference. The chattel mortgage executed and delivered to the plaintiff covered only the prune crop, and whatever inference may be drawn relative to the intent of the Orchard Company, bearing upon the question of possession as to the prune crop by the execution of the chattel mortgage, is rebutted by the fact that the peach, grape and other fruit crops on the premises were not included therein, and were left entirely to the care of the Insurance Company. Thus, if the intent of continued possession is manifested in one instance, the intent of abandonment is just as clearly shown in the other.

Following the letter by the Orchard Company advising the Insurance Company of the inability of the Orchard Company to finance and care for the crop during the year 1927, the removal from the premises by the Orchard Company of those who had formerly cared for the crops growing upon the mortgaged land and the testimony which we have summarized herein, it seems indisputable that the Insurance Company, on and after the nineteenth day of April, 1927, occupied the position of a mortgagee in possession, as that term is defined in 41 C. J., page 612, where it is said: "The term 'mortgagee in possession', is applied to one who has lawfully acquired actual possession of the premises mortgaged to him, standing upon his rights as mortgagee, and

not claiming under another title, for the purpose of enforcing his security upon such property or making its income help to pay his debt; but the mere fact that the mortgagee receives the rents and profits does not constitute him a mortgagee in possession unless he takes the rent in such a way as to take out of the hands of the mortgagor the management and control of the estate. In some jurisdictions it is essential that the possession of the mortgagee be acquired with the consent of the mortgagor at least before foreclosure proceedings, while in others his consent is not necessary if the possession is acquired in a peaceable and lawful manner.'' The possession here was acquired in a peaceable and lawful manner, and from the facts disclosed in the testimony it is evident that the possession of the Insurance Company was taken by and with the consent of the Orchard Company. The letter addressed by the Orchard Company to the Insurance Company disclosing the financial embarrassment of the Orchard Company, strongly evidences the intent to turn over the possession and permit the Insurance Company to cultivate, care for and harvest the crop. · ▇ Again, it is not necessary that the consent be in express words for the mortgagee to go into possession, but it may be implied from all the circumstances surrounding the transaction. (17 Cal. Jur., p. 1019.)

As to what constitutes a mortgagee in possession further appears in 17 California Jurisprudence, page 1016, and need not be further elaborated upon herein. The mortgagee who enters and takes possession of the mortgaged premises, cultivates, cares for and harvests the crops thereon, and markets the same with the consent of the mortgagor, entitles the mortgagee to deduct from the rents and profits received, all the expenses necessarily incurred in the cultivation, caring for and harvesting the crops.

This summary of the law is supported by the language found in 17 California Jurisprudence, page 1026, sections 298 et seq. ▇ The duty of the mortgagee under such circumstances is to account for all the rents and profits received and to apply the net profits toward the payment or discharge of the indebtedness. Where the possession has been turned over to the mortgagee, whatever profits there may be derived from the possession of the premises becomes an additional security for the indebtedness, and is to be applied

in the discharge thereof. (*Spect* v. *Spect,* 88 Cal. 437, see pp. 442 and 443 [22 Am. St. Rep. 314, 13 L. R. A. 137, 26 Pac. 203], where a number of authorities are cited.) Having obtained peaceable possession, the mortgagee is entitled to retain the possession until the debt is paid. (*Spect* v. *Spect, supra; Cameron* v. *Ah Quong,* 175 Cal. 377 [165 Pac. 961].)

That the right of a mortgagee in possession to gather the crops growing upon the premises and apply the net proceeds thereof toward the discharge of the indebtedness is superior to the rights of subsequent creditors and mortgagees, appears from Jones on Evidence, section 1436, volume 2, eighth edition. To the same effect is the case of *Lavensohn* v. *Ward,* 1 Cal. Unrep. 764.

The record shows that the plaintiff had notice of the possession of the Insurance Company and of the records to which we have referred. Having this notice the plaintiff was put upon inquiry as to the rights of the Insurance Company. (*Follette* v. *Pacific L. & P. Corp.,* 189 Cal. 193 [23 A. L. R. 965, 208 Pac. 295]; *Pell* v. *McElroy,* 36 Cal. 268; *Sheerer* v. *Cuddy,* 85 Cal. 270 [27 Pac. 713].) Other cases might be cited, but the case of *Follette* v. *Pacific L. & P. Corp., supra,* is sufficient.

What we have said herein is set forth as the law in the case of *Craig* v. *Burns,* 65 Mont. 550 [212 Pac. 856], where the Supreme Court of Montana had before it a question as to the rights of a mortgagee in possession to the rents, issues, profits and crops growing upon the mortgaged lands, and holding that under such possession the mortgagee, while required to account, was entitled to apply the net proceeds in discharge of the indebtedness due the mortgagee.

The cases cited by the appellant to the effect that an ordinary real estate mortgage gives to the mortgagee no right to the possession of the land, and creates no lien upon, or right to the crops growing and unsevered thereon, correctly state the law as we understand it, but those cases are readily distinguishable from the principles which we hold to apply to the instant case.

In *Freeman* v. *Campbell,* 109 Cal. 360 [42 Pac. 35], one of the cases relied upon by the appellant, the distinction was drawn between a mortgagee in possession and one not in possession. The mortgagee in possession as defined in that case is one who has gone into possession with the consent of

the mortgagor. ■ This, as shown by the authorities which we have cited, may be either express or implied, and and as the testimony in the instant case is sufficient to support a finding that the Insurance Company went into possession with the consent of the Orchard Company, the right of the Insurance Company to harvest the crops was not limited by the fact that the trust deed in and of itself conferred no lien upon the crops and conferred no right to the possession of the premises.

■ There is another principle involved in this action which we think supports the judgment of the trial court. The Insurance Company was not a trespasser. It was in possession of the premises covered by the trust deed, with the consent of the Orchard Company, and after a statement by the Orchard Company that it could not finance the cultivating, caring for and harvesting the crops. Under such circumstances the ruling applied in the case of *Lightner Min. Co.* v. *Lane,* 161 Cal. 689 [Ann. Cas. 1913C, 1093, 120 Pac. 771], would be applicable if the Insurance Company had no other basis upon which to claim the proceeds of the crops. In the Lightner case, *supra,* it was held that as there was no wilful trespass, an accounting should be had and only the profits awarded the plaintiff, after deducting the expenses of extracting the ore involved, by the defendant. In the instant case we have the finding of the court showing that the receipts from the prune crop did not equal the expenses incurred in cultivating, caring for, pruning, harvesting and marketing that crop.

Irrespective of the manner in which the Insurance Company charged the expenses of cultivating, caring for, harvesting and marketing the prune crop, the Orchard Company would only be entitled to the surplus of the proceeds after deducting the expenses, and the plaintiff in this action would not be entitled to any greater sum, and as the expenses exceeded the receipts, he is not entitled to any judgment. The circumstances disclosed in the record show that the prune crop was very light. There is no pretense, however, that this was due to any fault on the part of the Insurance Company, or that the Insurance Company did not properly care for the crop, or did not receive the full market price therefor.

In support of what we have said we cite the following cases: *Williams* v. *Gray,* 62 Mont. 1 [203 Pac. 524]; *Stewart*

v. *Halvorson,* 50 S. D. 590 [211 N. W. 457]; *Reynolds* v. *McMann Oil & Gas Co.,* (Tex. Com. App.), 11 S. W. (2d) 778; *White* v. *Yawkey,* 108 Ala. 270 [54 Am. St. Rep. 159, 32 L. R. A. 199, 19 South. 360]; *Locke* v. *Klunker,* 123 Cal. 231 [55 Pac. 993]; 17 Cal. Jur., p. 1026, sec. 298.

Being of the opinion that the testimony sufficiently supports the findings of the trial court, and that the conclusions of law were correctly drawn, it follows that the judgment should be affirmed. And it is so ordered.

Preston, P. J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on August 9, 1932.