This appeal arises from a suit brought by appellant Charles N. Nettles, as an individual, and appellant Peterman Lumber Company (Company), the corporation of which Mr. Nettles is the principal owner. The defendant-appellees are the Peterman State Bank (PSB), seven directors and officers of PSB, and the First National Bank of Birmingham (FNB). FNB is involved in the suit because one of its officers, Plato G. Britton, served on the board of directors of PSB.
Appellants brought suit against appellees seeking $2,500,000 compensatory and $5,000,000 punitive damages as a result of a series of events leading to the PSB's foreclosure of mortgages it held on both the Company's assets and Mr. Nettles's personal assets. The complaint claimed relief on the following grounds: fraud, economic coercion, breach of fiduciary relationship, breach of contract, misrepresentation, deceit, embezzlement, and negligence.
The case was tried before the judge without a jury. Appellants presented testimony for some five or six days. At the close of appellants' case, all appellees filed motions to dismiss under Rule 41 (b), ARCP. The trial court took the matter under advisement, and the parties filed extensive briefs. Subsequently, the trial court issued an order granting the motion dismissing the action. This appeal followed.
The facts in the case are somewhat involved. Appellant Charles Nettles was a successful businessman for many years and a prominent member of his community. The Company, which he practically wholly owned, was the principal industry and employer in the general area. PSB was the only bank in the area and was the Company's principal creditor.
For many years the Company enjoyed great financial success, and Mr. Nettles amassed considerable individual wealth. However, in 1963 a portion of the mill was destroyed by fire. It was rebuilt in 1964, but without adequate financing, and was never again profitable. Appellant Nettles's son, Bill Nettles, who had previously come to work for the Company, left active employment with the Company in 1968 due partly to the Company's adverse financial condition.
The financial condition of the Company became acute in 1970. Appellant Nettles was in poor health and advancing in years. The Small Business Administration (SBA) *Page 918 
held a first mortgage against the Company and was applying pressure for a sale of the business, or in the alternative foreclosure. Bill Nettles consulted an attorney in regard to bankruptcy, but was advised against such a course of action.
Bill Nettles also conferred with appellee Robinson Harper, President of PSB, informing Mr. Harper that bankruptcy was being considered. As a result of this conversation and the concern it generated, Mr. Nettles, his son Bill, and various representatives of PSB met to determine what could be done to avoid bankruptcy and all agreed that a sale of the business was the only viable solution-to sell the Company as a going concern. An assignment for the benefit of creditors had been contemplated; however, PSB refused to consummate the assignment on the advice of its attorney. The trial court expressly found that there was a mutuality of interests as to both appellants and appellees in preventing foreclosure and liquidation of the business. The trial court further found that appellant Nettles considered his courses of action and elected to attempt to continue the operation of the Company in order to sell it as a going concern.
Subsequently, Bill Nettles, after much difficulty in finding a purchaser, negotiated a sale of the business to Darrell Kelsoe. Bill Nettles handled the negotiations between Mr. Kelsoe and himself, but PSB was kept informed of the progress of the negotiations. Mr. Kelsoe was the only potential purchaser and was acceptable as such to PSB. A buy-sell agreement was prepared by PSB's attorney and was signed by Charles Nettles and Darrell Kelsoe on September 21, 1970. Appellant Nettles relinquished control, and Mr. Kelsoe began running the Company immediately thereafter.
For reasons that are not clear, but apparently due to intervention by the SBA, the sale itself was never consummated, although Mr. Kelsoe continued to operate the Company. Accordingly, an agency agreement, prepared by PSB's attorney, was executed by Charles Nettles, as President of the Company, in October 1970 (backdated to September 23, 1970), authorizing Mr. Kelsoe to operate the Company "for the benefit of its creditors until such time as some orderly disposition of the assets of said Corporation can be made." The next day, at the request of Charles Nettles, the agency agreement was modified to provide that Mr. Kelsoe could be dismissed upon seven days notice by the Company.
The Company continued to have financial difficulties. It had difficulty in meeting its payroll and had several bad checks outstanding. In a further effort to save the Company, Charles Nettles executed additional notes to PSB secured by mortgages on his personal assets, including his home and certain tracts of land.
In the early part of 1971, the SBA continued to threaten foreclosure unless the Company's financial condition improved. In order to forestall that eventuality, PSB acquired the SBA's interest in the first mortgage. However, the situation did not improve, and in June 1971, PSB foreclosed on the property of the Company and appellant Nettles, with the exception of Mr. Nettles's home, which was foreclosed on in March 1972. PSB's bid on certain properties was the highest received at the foreclosure sales, and it became the purchaser of such properties. Subsequently, in order to clear title to the properties so that a greater amount could be realized upon resale, Charles Nettles and his wife executed a waiver of redemption rights in the foreclosed properties. Thereafter, a sale was held in which several bids were made. Certain of the properties were sold to various directors of PSB, their bids being the highest.
The amounts realized from the resales were credited to the obligations of Charles Nettles and the Company, reducing the total indebtedness from $435,890.05 to $107,175.34 plus interest and additional expenses. PSB rendered Mr. Nettles's attorney an accounting in June 1972.
The issue we are called upon to review is whether the trial court erred in granting the Rule 41 (b) motion. Rule 41 (b), ARCP, provides in pertinent part as follows: *Page 919 
 After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. . . .
The Committee Comments to Rule 41 (b) reveal the following:
 In a jury case, Rule 50 applies and the court is limited to a question of law (thereby preserving jury trial right) as to the sufficiency of plaintiff's prima facie case. In a non-jury case, the court, under Rule 41 (b), as ultimate trier of fact, is free to weigh the evidence and the credibility of the witnesses. . . .
Moreover, as to our review of the trial court's finding of fact, Rule 52 (a) of the ARCP provides, "Findings of fact shall not be set aside unless clearly erroneous. . . ." The Committee Comments to Rule 52 (a) state, "The scope of review under present Alabama practice prevents reversal of the trial court's findings where the evidence was taken in open court, or partlyso, and the trial court has had the advantage of seeing the witnesses, unless the trial court's conclusion is plainly and palpably contrary to the weight of the evidence."
Accordingly, the standard for review on appeal of a trial court's disposition under a Rule 41 (b) motion is whether the trial court's action is supported by the evidence. Stricklandv. National Gypsum Co., 348 So.2d 497, 498 (Ala.Civ.App. 1977).
Appellants contend, however, that the ore tenus rule is inapplicable in this case because only a portion of the evidence was heard orally by the trial court and the facts of the case were indisputably established. In support of this proposition, appellants cite Hendrix, Mohr Yardley, Inc. v.City of Daphne, 359 So.2d 792 (Ala. 1978); Taylor v. Godsey,357 So.2d 979 (Ala. 1978); and City Stores v. Williams,287 Ala. 385, 252 So.2d 45 (1971). Thus, appellants argue that this court is not bound by the trial court's findings. However, the Comments to Rule 52 (a), as set out above, state that the presumption in favor of the trial court's findings applies even when the evidence only partly consists of oral testimony before the trial court. Moreover, as will appear below, the factual premises underlying appellants' theories for relief are not immutably established by the evidence. Therefore, the question becomes whether there was sufficient evidence to support the trial court's findings.
The trial court ruled: "[T]he majority of the plaintiff's [appellants'] claims are barred by the statute of limitation. The Court is further satisfied that the evidence is insufficient to create a trust relationship." We agree that the majority of appellants' claims are barred by the applicable statutes of limitations. The events leading to foreclosure occurred in the fall of 1970-ten years ago-and the foreclosure itself occurred in mid-1971 with resale of the property in the spring of 1972. Suit in this case was not filed until four years later, on November 10, 1976. The complaint broadly alleges recovery on the following theories of relief: fraud; deceit; misrepresentation; embezzlement, a criminal action; economic coercion; negligence; breach of contract; and breach of fiduciary relation. The majority of these claims are clearly barred by the statutes of limitations. The tort claims-fraud, deceit, misrepresentation, economic coercion, and negligence-are barred by the one-year statutes of limitations.See Code 1975, §§ 6-2-3 -39. The remaining theories of recovery, and the theories argued on appeal, are for breach of contract or breach of some fiduciary relationship.
Appellants' contentions on appeal revolve around two focal points: first, the series of events in the fall of 1970 leading to relinquishment of the operation of the Company to Mr. Kelsoe and, second, the resale of certain foreclosed properties in 1972. *Page 920 
Appellants first contend that PSB, during the events leading to the Kelsoe operation of the Company, assumed control of the Company and, thereby, became a mortgagee in possession. A mortgagee in possession, appellants contend, is a trustee for the mortgagor. Accordingly, appellants reason "that there is a remedy available to the plaintiff under the law of trust," PSB being a mortgagee in possession. The exact nature or theory of the trust (or fiduciary) relationship asserted by appellants is not clear. Appellants state that "this case is one of first impression" and "it becomes this court's task to define what duties were owed plaintiffs by defendants during the fall of 1970 and the spring of 1971."
A mortgagee in possession does hold the property as a trustee to the extent that he must account to the mortgagor for rents and profits and must exercise reasonable diligence in collecting such rents and profits as well as in preventing waste of the estate. See, e.g., Alexander v. Hicks, 242 Ala. 243, 5 So.2d 781, 783 (1942).
Notwithstanding the legal responsibility of a mortgagee in possession, it must first be established that the mortgagee is actually in possession or has taken control of the property-a question of fact. The trial court found that PSB did not assume control of the Company: "The Court is not satisfied by the evidence that the bank assumed the operation of the mill in the fall of 1970." The trial court found that had the business been liquidated in the fall of 1970, Mr. Nettles's personal losses would have been much less; however, the trial court was not satisfied that any of the appellees induced appellant Nettles not to liquidate or bankrupt. On the contrary, the trial court determined that Mr. Nettles wanted to salvage the business as much as appellees did. The trial court found that appellees, in fact, actively participated in the attempt to save the Company, even to the extent of preparing documents, but concluded "[t]he fact that certain documents were prepared by the defendant Bank's attorney or representations that Kelsoe had entered into a `binding contract' to purchase the mill, [do] not satisfy the Court that the defendant bank had in effect assumed the operation of the mill." We find from the record evidence to support the trial court's finding.
The record discloses that both appellants and appellees were desirous of continuing the operation of the mill. Appellant Nettles had considered liquidation of the business; however, he, as well as appellees, did not want to see the business close down. Accordingly, it becomes clear from the record that the parties shared a mutual interest in keeping the Company operating, and they began working together in the fall of 1970 to achieve this common end.
Appellees took an active role in attempting to improve the Company's financial position: appellees made various recommendations, caused various documents to be prepared, made additional secured loans, and kept close tabs on the Company's operation. Notwithstanding this active role, the essential relationship between the parties remained that of debtor-creditor, and the parties dealt with each other at arm's length. Appellees did take an active role in regard to the Company's position-it was, after all, the principal employer in the area and the principal debtor of PSB-and appellant Nettles did acquiesce in the recommendations of appellees, but he was free to reject appellees' recommendations and pursue his own course of action. Mr. Nettles, when questioned why he executed a particular instrument or took a particular course of action, repeatedly answered in his testimony that it was because PSB told him to. Mr. Nettles reposed great confidence in appellees and freely co-operated with them; however, PSB cannot be said to have ousted Mr. Nettles and assumed control of the Company by the mere fact of such co-operation.
Mr. Nettles was an experienced businessman, though admittedly in poor health during the fall of 1970, and he had the advice of counsel and of his son. There is evidence that he was informed of the operation of the Company and initiated correspondence with creditors of the Company after execution *Page 921 
of the agency agreement. Furthermore, Mr. Nettles admitted that he did have the power under the agency agreement to terminate Mr. Kelsoe's agency:
 Q. Your agreement, the agency agreement, had been with Mr. Kelsoe, not with the bank, had it not?
A. In name, yes.
 Q. And under the terms of the agency agreement, you could have terminated it either on written notice, or certainly on the terms of your modification, within seven days, at any time, after October 19, could you not?
A. That was in the contract.
The operation of the Company was placed in the hands of a third party, Mr. Kelsoe, originally pursuant to a buy-sell agreement negotiated by Bill Nettles. Later, when the sale did not go through due to the demands of the SBA, an agency agreement was executed permitting Mr. Kelsoe to continue to operate the mills, which agreement, at the insistance of appellant Nettles, was amended to allow him to terminate Mr. Kelsoe's agency upon seven days' notice.
Although appellees took an active role in attempting to save the Company, the facts simply do not establish that they assumed control of the management of the business. Similarly, the fact that appellant Nettles reposed great confidence in appellees' ability to save his business and the fact that he acquiesced in their recommendations, ultimately to his financial detriment, does not serve to establish some special fiduciary relationship which renders appellees liable for the unfortunate events of this case.
Appellants rely heavily upon the case of Nelson v. Bowen,124 Cal.App. 662, 12 P.2d 1083 (1932), in support of their contention that PSB was a mortgagee in possession. In that case, an insurance company held a mortgage on an orchard. The orchard company could not secure financing to fund the annual harvesting of the crops and so informed the insurance company. The trust deed given to secure the indebtedness to the insurance company empowered said company to do the necessary work to care for the crops should the orchard company fail to do so. Accordingly, the insurance company hired an agent to move onto the farm and cultivate the crops; the insurance company advanced the necessary funds and superintended all the work in managing the farm, caring for and harvesting the crops. The owner of the orchard company moved with his family from the farm to another city, where he sold the orchard company to a third party, and never returned. The court determined that the insurance company was a mortgagee in possession, at least as to the claim alleging conversion of the crops upon subsequent sale.
The instant case is sufficiently distinguishable. There were no documents granting PSB the power to assume management of the Company. None of PSB's agents or employees entered the premises and operated the business. Mr. Kelsoe, a third party located by Bill Nettles in connection with a contemplated sale, ran the business as an agent of the Company, not PSB, and the agency was terminable at will. PSB did advance operating funds in the form of secured loans to the Company, but did not directly pay its day-to-day expenses. Appellant Nettles did not sell his interest in the Company, but instead remained keenly interested in the business, suggesting plans of action even though he was asked not to interfere with Mr. Kelsoe's operation of the business.
Thus, we find that there was sufficient evidence to support the trial court's finding that PSB did not assume control of the Company, and was not, therefore, a mortgagee in possession.
Appellants' second contention is that a trust and contractual relationship resulted from the execution of the waiver of redemption rights by appellant Nettles and his wife. Since some of the appellee-directors of PSB purchased Mr. Nettles's home and land at the resale, appellants assert that appellees violated their trust responsibilities by engaging in self-dealing. Appellants contend, that as a result of breach of trust they are "armed with an *Page 922 
election to affirm [or] to disaffirm" and, accordingly, they seek to disaffirm the resale and to recover the properties or, in the alternative, to liquidate the properties for the benefit of appellant Nettles's creditors. Appellants also assert that appellees contracted with Mr. and Mrs. Nettles to obtain a considerably greater price at resale of the foreclosed properties if they would waive their rights of redemption in the properties. Appellants contend the properties were resold for much less than the values assigned to the properties in a PSB directors' meeting and therefore appellees are liable for breach of contract. In support of both theories of recovery, appellants rely on Tolleson v. Henson, 207 Ala. 529, 93 So. 458
(1922).
In preparing for the foreclosure sales in the instant case, estimates of values were assigned to the properties to be sold. At the foreclosure sales, the actual amounts bid for some of the properties were the estimated values; however, the bids of PSB were in many instances the highest bids for the properties PSB purchased at foreclosure. PSB planned a resale of the property it acquired at the foreclosure sale. On the advice of its attorney, the directors determined that if the title was cleared by the Nettleses' waiving their redemption rights, a higher price could be obtained upon resale. The bids at resale, again, were not as high as the values estimated for the properties. Some of the properties were purchased individually by some of the appellee-directors; nevertheless, the amounts realized upon resale were greater than the amounts for which the properties were sold at the foreclosure sales. For instance Mr. Nettles's farm and timberland went for $20,950 more at resale. The amounts realized from the resale were credited to appellants' indebtedness.
In Tolleson, plaintiff, decedent's widow, individually and as administratrix of her husband's estate, filed a bill in equity for an accounting to purge part of a mortgage debt of usury and for a decree for money had and received. Plaintiff and her husband had owned 400 acres of land. They gave first and second mortgages to G.M. Forman and third and fourth mortgages to defendant. Forman's transferee foreclosed on the second mortgage of $423.15, and defendant purchased the property at public sale for $450, subject to the first mortgage of $3,869.15. In return for a quitclaim of their rights of redemption, defendant had promised to sell the property and, after deducting the amount of the first mortgage and the amounts due him as mortgagee under the third and fourth mortgages, to pay them the balance. The property was sold for $11,000; defendant never remitted any sums to plaintiff and her husband. The court upheld the trial court's overruling of the demurrer to the bill. The court found that the bill for an accounting contained equity since the averments showed mutual accounts between the parties. Additionally, the court stated, "the bill also discloses facts showing that a fiduciary relation exists between the parties," 207 Ala. at 530,93 So. at 459; however, the court did not specify the nature of such relationship nor the legal consequences stemming therefrom. Moreover, the statement concerning fiduciary relationship was made in the context of a finding that the bill for an accounting contained equity so that it was not demurrable.
In the instant case, the matter went beyond the pleading stage to a full presentation of appellants' case on the merits. Furthermore, appellees fully accounted for the proceeds from resale, unlike the defendant in Tolleson. Notwithstanding the language in Tolleson as to a fiduciary relationship, we are not satisfied that any relationship existed between these parties other than that of debtor-creditor, with both parties attempting to effect as profitable a resale as possible. The trial court expressly stated, "In this case the Court questions the judgment and actions of the defendant directors in purchasing at resale certain of the plaintiff's foreclosed properties, yet the Court is not satisfied by the evidence that there were others willing to pay as much." We find that the trial court's finding was supported by the evidence. *Page 923 
As to the contract claim for failing to sell the properties for their estimated value, the waiver of rights of redemption instrument executed by Mr. and Mrs. Nettles and PSB recites that in consideration of $1.00 and other valuable considerations, appellant Nettles and his wife, grant, bargain, sell and convey unto PSB their statutory rights of redemption. Thus, selling the properties for "considerably" more than was realized at the foreclosure sales was not a condition or term of the contract; if anything, it was, as appellees contend, an inducement to enter into the contract.
Our review of the record in this case fails to show that appellees represented to Mr. Nettles's son that on resale the foreclosed properties would sell for the protective bid prices established by the board of directors of PSB in connection with the foreclosure sales. The only evidence we find was from the report of director A.A. Nettles, Jr., contained in the minutes of the meeting of the board held November 9, 1971, as follows:
 It was emphasized to him [Bill Nettles] that cooperation on the part of his father through the signing of the rights of redemption to the bank was very important to the prompt and orderly liquidation of the assets represented by Peterman Lumber Co. and lands formerly owned by his father. He was also told that it was the intention of the bank to apply all proceeds from the liquidation of property to the reduction of the indebtedness, and that we expected to be able to offer the property financed as soon as the title could be cleared, and would sell it for considerably more than the bank bought it in for at the mortgage foreclosure sale. Any additional funds from such a sale would benefit his father through the reduction in his indebtedness. [Emphasis added.]
In any event, appellees did sell the properties on the whole for "considerably" more than the foreclosure bids and the proceeds were applied in reduction of appellants' indebtedness. Clearing the title to the properties by obtaining a waiver of the rights of redemption was a good faith effort to realize the maximum amount possible at resale to the mutual benefit of appellants and PSB. We cannot say that because the resale values were not as high as originally estimated for the purpose of protective bidding, that appellees breached any duty, contractual or otherwise, to appellants. We find no evidence from the record that the sale was not conducted properly or that reasonable efforts were not made to render it successful.
The events of this case are unfortunate. However, after careful consideration, we find that there was sufficient evidence to support the trial court's findings and that the motions to dismiss were properly granted.
Accordingly, this case is due to be affirmed.
AFFIRMED.
TORBERT, C.J., and MADDOX, FAULKNER, ALMON and EMBRY, JJ., concur.