[No. A050584. First Dist., Div. Five. June 27, 1991.]

KENNETH H. EARP, Plaintiff and Respondent, v.
DORIS N. EARP, Defendant and Appellant.

## COUNSEL

Loube, Lowen, Klein & Sack, Loube, Lowen & Sack, Michael S. Klein and David Timko for Defendant and Appellant.

Chandler, Brunner & Ricks, Stephen M. Chandler for Plaintiff and Respondent.

## OPINION

KING, J.—In this case we hold that where the lease of a mobilehome park was intended to be security for payment of a debt, the lease was in effect a mortgage, and thus the lessee's rights to accrued profits from operation of the mobilehome park were limited to the amount of the debt, plus interest. Doris N. Earp appeals from a judgment determining that she owed $290,656 plus interest to her former husband, Kenneth H. Earp, pursuant to her lease of the mobilehome park from Kenneth. We affirm.

A 1983 judgment of dissolution required Kenneth to pay Doris $723,341 plus interest to equalize the division of community property. Both parties appealed. In an unpublished decision, we modified the judgment to correct a mathematical error. (*In re Marriage of Earp* (Feb. 1, 1988) A024976.)

While the appeal was pending, Doris obtained and recorded a writ of execution on the mobilehome park. Kenneth asked Doris to stay her writ, and she indicated she would do so provided she would have adequate

security. As a result, on June 30, 1987, the parties negotiated a five-year lease of the park to Doris. Under the terms of the lease, Doris paid the park's operating expenses, assumed Kenneth's insurance premiums and mortgage payments, and withdrew her writ of execution. The lease required Doris to make the payments from rents paid by the park's tenants, and provided that any surplus funds (i.e., the excess of rents received over payments made) would be held in a "tenant reserve fund." Under section 3.7 of the lease (Section 3.7), surpluses in the reserve fund were to be "carried forward only to the end of each calendar year when such surplus funds shall become the property of [Doris]." Kenneth was given the option of terminating the lease by making his equalizing payment to Doris before June 30, 1988. Under section "C" of an amendment to the lease, if Kenneth exercised this option he would be "entitled to receive the balance of the tenant reserve fund as of the date he makes such payment." If he failed to meet this deadline, Doris could purchase the mobilehome park by relieving Kenneth of the equalizing obligation and assuming his mortgage.

Kenneth exercised his option on June 9, 1988, making the full equalizing payment as modified by the appellate judgment. At that time there was $290,656 in the reserve fund. Kenneth demanded this sum under the provision of section "C" giving him "the balance of the tenant reserve fund." Doris refused. She asserts that under section 3.7, surplus funds of approximately $186,500 through the end of 1987 had become her property, so that Kenneth was only entitled to remaining surplus funds that had accrued after January 1, 1988, which were exceeded by an amount Kenneth owed her on two promissory notes.

Kenneth sued Doris for, among other things, the total amount of the reserve fund, plus $6,373 which Doris had taken from the reserve fund to pay attorney fees already paid by Kenneth. On May 7, 1990, the court issued a written "decision" on the reserve fund issue, finding that Kenneth was "entitled to all funds in the tenant reserve fund as of June 9, 1988." Trial on other issues was continued to a later date. The court issued a "partial judgment" on July 2, 1990, stating more specifically that Kenneth was "entitled to all funds in the Tenant Reserve Fund . . . for the period July 1, 1987 through June 9, 1988, regardless of where the Funds were deposited or transferred to by [Doris] . . . ."

On the day the partial judgment was issued, trial was held on the remaining issues, and the court ruled that Kenneth was entitled to the additional $6,373 which Doris had taken from the reserve fund to pay attorney fees. Doris's counsel requested a statement of decision on all issues, but the court ruled the request was untimely as to the reserve fund issue because that issue had already been determined by the "partial judgment." (See Code Civ.

Proc., § 632 [request for statement of decision after one-day trial must be made before submission of matter for decision].) The court subsequently rendered a final judgment for Kenneth in the total sum of $297,029, consisting of the $290,656 in the reserve fund plus the $6,373 used to pay the attorney fees.

■ Doris first contends the court erred when it denied a statement of decision on the reserve fund issue. There was no error. The court tried that issue separately and before the trial of other issues (Code Civ. Proc., § 1048, subd. (a)), so that a statement of decision on the reserve fund issue could be separately requested (Cal. Rules of Court, rule 232.5). Because the separate trial lasted less than a day, any request for a statement of decision had to be made before submission of the matter for decision. (Code Civ. Proc., § 632.) Doris failed to do this, and thus her request at the subsequent trial of remaining issues was untimely.

Doris argues the request was timely because she made it immediately after rendition of the partial judgment. She relies on a pre-1983 provision in rule 232 of the California Rules of Court which required findings if requested within 10 days after mailing of a modification of a decision. That provision is irrelevant, however, since no similar version appears in any current court rule or statute.

There is another reason why no statement of decision was required. As Doris herself concedes, the interpretation of the lease was a question of law, since no extrinsic evidence was admitted. (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].) The record does not demonstrate a material factual issue on any other point, such as the amount of money in the reserve fund. Where there are no factual issues, and only a pure question of law is presented, the court need not issue a statement of decision. (*Enterprise Ins. Co.* v. *Mulleague* (1987) 196 Cal.App.3d 528, 539-540 [241 Cal.Rptr. 846].)

■ Doris also contends that, as a matter of law, the lease must be interpreted as entitling her to all surplus money in the reserve fund as of the end of 1987. Relying on the general rule requiring an interpretation which gives effect to every part of a contract (Civ. Code, § 1641), she asserts that section "C" of the lease, which gave Kenneth "the balance of the tenant reserve fund" as of the date he exercised his option, can be harmonized with section 3.7, which gave Doris the contents of the reserve fund at the end of each calendar year. Because the court received no extrinsic evidence, the meaning of these provisions is a question of law, subject to our independent interpretation. (*Parsons* v. *Bristol Development Co., supra*, 62 Cal.2d at p. 865.)

Doris is correct to the extent there is not necessarily an intrinsic conflict between the two provisions. The existence of a conflict turns on the meaning of the word "balance" in section "C." If the "balance" in the reserve fund on the date Kenneth exercised his option means the total amount of money in the reserve fund on that date, then there is a conflict, since section 3.7 gave Doris some of that money (the amount accrued at the end of 1987). But the word "balance" can mean "an amount in excess on the credit side of an account." (Webster's Third New Internat. Dict. (1965) p. 164.) With this interpretation, the "balance" in the reserve fund does not include surplus funds through the end of 1987, and thus there is no conflict, since section 3.7 gave that money to Doris and thereby removed it from the "credit side" of Kenneth's interest in the lease.

Ordinarily, we would adopt the latter interpretation, and construe section 3.7 as entitling Doris to the amount in the reserve fund at the end of 1987, in order to give effect to both sections of the lease. But there is a fundamental problem with that interpretation, arising from the law of mortgages.

■ Kenneth has consistently argued, both below and on appeal, that the lease was in effect a mortgage. He is correct. "Every transfer of an interest in property, other than in trust, made only as a security for the performance of another act, is to be deemed a mortgage . . . ." (Civ. Code, § 2924.) Doris's answer to Kenneth's complaint admitted his allegation that the lease was negotiated "as a result" of her desire for security. This is tantamount to a concession that the parties intended the lease to be security for Kenneth's performance of his equalizing obligation.

Moreover, when the sales price of property bears no proportion to its market value, this is a compelling indicator that the parties intended a transfer of interest to be security. (*Husheon* v. *Husheon* (1886) 71 Cal. 407, 412 [12 P. 410]; see also *Beeler* v. *American Trust Co.* (1944) 24 Cal.2d 1, 17 [147 P.2d 583]; *Rickless* v. *Temple* (1970) 4 Cal.App.3d 869, 890 [184 Cal.Rptr. 828].) Such is the case here. If Kenneth had failed to make the equalizing payment, Doris could have purchased the mobilehome park for a price—the amount of the equalizing debt plus Kenneth's future mortgage payments—which bore absolutely no relationship to the park's market value.

Ordinarily, the lack of proportion of price to value is demonstrated by great inequality between the two. (E.g., *Husheon* v. *Husheon, supra*, 71 Cal. at pp. 412-413.) In this case, however, the record does not indicate market value at the time the lease was executed. Kenneth contended that in 1988 the park was worth at least $14 million and had an encumbrance of $10,690,000, but Doris's answer denied the park was worth this amount, admitting only

that it had a net value of $5,478,607 in 1982. The court received no evidence of market value, and thus there is no evidentiary basis for presuming the court resolved this dispute in Kenneth's favor. But this gap in the record is inconsequential. It is undisputed that whatever the property's precise value, it was significantly more than Doris's purchase price.

■ We must therefore conclude that the lease was intended to be security for the equalizing debt, and thus is to be deemed a mortgage. Consequently, Doris was a mortgagee in possession of the mobilehome park. As such, her rights to accrued profits from operation of the park were limited to the amount of Kenneth's equalizing debt, plus the interest thereon. (*Nelson* v. *Bowen* (1932) 124 Cal.App. 662, 670-671 [12 P.2d 1083].)

Doris contends it is reasonable to conclude the parties intended she would also receive compensation for personally operating the park. ■ But as a mortgagee in possession, she was not entitled to compensation for her personal services. (*Wadleigh* v. *Phelps* (1906) 149 Cal. 627, 644-645 [87 P. 93]; *Benham* v. *Rowe* (1852) 2 Cal. 387, 408.) This well-worn rule against personal compensation to a mortgagee in possession applies even where the parties had agreed otherwise. "The general rule is that a mortgagee, even after he has taken possession under his mortgage, is not entitled to compensation for his personal trouble in taking care of the estate, and renting it, although the mortgagor has agreed that he may have such compensation; the reason being that to allow such compensation would tend directly to facilitate usury and oppression." (*Snow* v. *Warwick Institution for Savings* (1890) 17 R.I. 66 [20 A. 94].) Denial of such compensation to Doris is thus not a forfeiture, as she contends, but is the implementation of a policy against oppression by mortgagees in possession, who, after all, take possession "for the furtherance and protection of [their] own interests." (*Benham* v. *Rowe*, *supra*, 2 Cal. at p. 408.)

■ The law of mortgages therefore precludes Doris from retaining any portion of the reserve fund. This being the case, it would be pointless, and thus incorrect, to construe section 3.7 otherwise, since any such construction would render that section unlawful and without legal effect. (Civ. Code, §§ 1641, 1643.) Accordingly, we must conclude, as did the trial court, that Kenneth was entitled to the total amount of the reserve fund during the period July 1, 1987, through June 9, 1988.

This conclusion does not result in any unfairness to Doris, for two reasons. First, it is not clear she expended significant personal effort in operating the mobilehome park. At oral argument Kenneth's counsel asserted, and Doris's counsel did not deny, that the property was in large

measure operated by an on-site manager paid from operating income. Second, to whatever extent Doris did expend personal effort, in return she obtained a tangible and apparently desired benefit: control over the preservation of her security. She stood to gain a great deal if Kenneth failed to pay the equalizing debt, for she could have obtained the property for substantially less than its value, assuming it was properly preserved as a money-making enterprise. Like any mortgagee in possession, Doris wanted to maintain control over the preservation of her security interest. She got what she wanted, as well as the potential (though ultimately unrealized) for obtaining the mobilehome park at a bargain price. The rule against additional personal compensation says to Doris, in effect, that as a matter of fairness, "you've received enough." That rule makes as much sense when applied to this case as it did when first articulated in California 140 years ago.[1]

The judgment is affirmed.

Low, P. J., and Haning, J., concurred.

---

[1] Kenneth contends the judgment was also correct on the ground Doris's retention of money in the reserve fund would amount to usury. The trial judge expressly declined to address this point, since the judge concluded the lease did not give Doris the right to retain any of that money. For the same reason, we need not decide the usury issue on appeal. Kenneth also requests sanctions on the ground the appeal is frivolous. Sanctions are inappropriate. The dispositive equitable principles in this case, though ancient, are too complex for us to conclude that no reasonable attorney would have prosecuted the appeal. (See *In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650 [183 Cal.Rptr. 508, 646 P.2d 179].)